UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

UNITED STATES OF AMERICA

v.                                                    CRIMINAL ACTION NO. 5:24-cr-00139

JAMES BENNETT

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant James Bennett's Motion to Suppress Statements [ECF 46], filed June 30, 2025. On July 11, 2025, the Government responded in opposition. [ECF 51]. On August 18, 2025, the Court held an evidentiary hearing. Mr. Bennett and counsel Clint Carte appeared. Also present was Assistant United States Attorney Brian Parsons. The Court heard testimony from two witnesses, Special Agent Samuel Supnick and Senior Special Agent Brian Luley, both with the United States Department of Justice Office of the Inspector General. The parties also submitted post-hearing briefing on the matter. [ECF 68-70].

**I.**

Defendant James Bennett is a former corrections officer at FPC Alderson. [ECF 1]. He is alleged to have engaged in sexual conduct with three inmates while acting in his capacity as a corrections officer. [*Id*.]. On August 27, 2024, as a result of these allegations, a seven-count Indictment was returned against Mr. Bennett. [*See* ECF 1]. He is charged with one count of Sexual Contact with and by Another Person, with Intent to Abuse, Humiliate, Harass, Degrade, and Arouse and Gratify the Sexual Desire of a Person, in violation of 18 U.S.C. § 2244(a)(6) (Count

I) and six counts of Engagement in a Sexual Act of a Victim who was in the Official Detention and under the Custodial, Supervisory, and Disciplinary Authority of Defendant who was a Corrections Officer, in violation of 18 U.S.C. § 2243(b) (Counts II-VII). [*Id*.].

On September 4, 2024, Mr. Bennett was arrested. Prior to his arrest, he was interviewed twice by Department of Justice Agents. [ECF 46 at 1]. The first interview took place on April 30, 2024, at FPC Alderson. [ECF 51 at 1]. On July 2, 2024, he was interviewed a second time at the West Virginia State Police Office in Lewisburg. [*Id*. at 2]. He was advised of his *Miranda* rights and executed a waiver to that effect. [*See* ECF 51-2]. He nonetheless challenges the legality of his July 2, 2024, statements, contending suppression is warranted inasmuch as his statements were rendered involuntary by officer coercion. [ECF 46 at 2].

Specifically, Mr. Bennett contends his "will was overborne during the course of the lengthy and coercive interrogation, in which his capacity for self-determination was so impaired as to make his statements involuntary." [*Id*. at 3]. He asserts officers (1) made him promises, (2) made improper statements of law, (3) gave false assurances, (4) subjected him to a cognitive load, (5) placed "heat" on him, (6) and bore down on him until he made admissions "that only exacerbated the pressure and aggressiveness of the setting." [*Id*. at 5]. In support of these contentions, he cites to various portions of the 125-page interview transcript as evidence of officer coercion. [*See generally* ECF 46-1]. For instance, he references, *inter alia*, officers indicating they were putting "heat" on him, noting his "cognitive load," insisting he "let it out," "accept responsibility," and "move on with [his] life," and assuring him his children were "going to be okay." [*Id*.]. The following excerpts demonstrate specific examples:

> Officer: "Move forward. Close this chapter. Be a man and own up to your responsibility. Own up to your mistakes. Take extreme ownership. We can do it here today, James. I know you have it in you. You were taught this. You were taught to do this. Cash that chip in here today. Do it. You were taught honesty, integrity growing up as a child and as a man. You

got to cash that chip in here today. Because it's going to reward you. I'm telling you, it's going to reward you. You have no idea how much it's going to reward you once you cash that chip in." [*Id*. at 91].

Officer: "Cash it in here today and you will be rewarded for it. No one in the history of getting in trouble has ever gotten in more trouble when they've owned up to their mistakes." [*Id*. at 94].

Officer: "Sometimes when people resign or sometimes people leave. Sometimes that's the close, that's the end of the case. Sometime when people accept and own up to the responsibility for what has happened, that's sometimes good enough for prosecutors. But that kind of acceptance of responsibility has to happen here today." [*Id*. at 18].

Mr. Bennett maintains his admissions were merely adoptions of the scenarios presented by the officers. He thus contends his statements should be deemed involuntary, rendering "any advising of his rights at the outset of the interrogation obsolete." [*Id*. at 6]. In his post-hearing briefing, Mr. Bennett also emphasizes the interview environment as contributing to the coercive nature of the interrogation. [*See* ECF 69]. For instance, he highlights the police station location, the three-hour duration of the interview, the "robust" presence of officers on the premises, and that he was alone and uncounseled while being questioned by three, armed officers. [*Id*. at 5; *see also* ECF 70]. He also notes despite his background as a corrections officer, he is unfamiliar with investigations and interrogations. [*Id*.]. Mr. Bennett asserts his background, combined with the details of what occurred during the interview, and the interview setting, proved coercive and induced an involuntary statement. [*Id*. at 6].

The Government responds at no point during the interview was Mr. Bennett physically threatened or "coerced within the meaning of the law." [ECF 51 at 2]. Rather, the Government maintains Mr. Bennett was thoroughly advised of his rights despite the non-custodial nature of the interview, was aware of his ability to cease the interview at any point, and chose to provide voluntary statements to officers. [*Id*. at 4-5]. While the Government acknowledges the

3

interview took place at the police station, it emphasizes "the chosen location was based on convenience, to ensure the safety of government personnel and the privacy of [Mr. Bennett]." [ECF 68 at 5]. The Government contends the interview setting was "relatively comfortable," taking place in an unlocked office rather than an interview room or a holding cell. [*Id*. at 4]. It further highlights Mr. Bennett left the interview freely and was not arrested until indicted two months later. [*Id*.]. In sum, the Government maintains there is an absence of evidence negating the voluntariness of Mr. Bennett's statements. [ECF 51, 68].

## II.

### A. *Governing Standard*

"The Self-Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *United States v. Purks*, 139 F.4th 338, 395 (4th Cir. 2025) (quoting *Withrow v. Williams*, 507 U.S. 680, 688 (1993)). "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda v. Arizona* . . . and the defendant knowingly, intelligently, and voluntarily waives those rights.'" *Id*. (quoting *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (cleaned up)).

Nonetheless, "an accused's statements to the police during a custodial interrogation, even when preceded by a valid Miranda waiver, must be voluntary to be admissible." *United States v. Ordonez-Zometa*, 141 F.4th 531, 552 (4th Cir. 2025) (citing *United States v. Cristobal*, 239 F.3d 134, 140 (4th Cir. 2002)). "A challenged statement is admissible if, given the totality of all of the surrounding circumstances, the defendant's decision to speak with law enforcement was the product of an essentially free and unconstrained choice and the statement was made without any compelling influences." *Id*. (internal citations and quotations omitted).

4

"Conversely, if the defendant's 'will has been overborne and his capacity for self-determination critically impaired,' principles of due process bar the use of his statements." *Id*. (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). "The test for determining whether a statement is voluntary under the Due Process Clause 'is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.'" *Purks*, 139 F.4th at 396-97 (quoting *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997)).

Importantly, however, "neither uncomfortable circumstances nor a misstep by law enforcement will render a statement involuntary." *Ordonez-Zometa*, 141 F.4th at 552-53 (citing *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) ("Numerous cases reiterate that statements by law enforcement officers that are merely 'uncomfortable' or create a 'predicament' for a defendant are not ipso facto coercive.")). Indeed, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary.'" *Purks*, 139 F.4th at 397 (quoting *Giddins*, 858 F.3d at 881). Rather, "[t]he proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination is critically impaired." *Id*. (internal quotations omitted).

**B.    Analysis**

In assessing the totality of the circumstances, the record is devoid of evidence demonstrating Mr. Bennett's statements were extracted by threats, violence, false promises, or exertion of improper influence. Indeed, contrary to Mr. Bennett's assertions, at no point did officers make false promises, assurances, or improper statements of law. In fact, officers explicitly advise him during the interview no promises would be made, nor would he be questioned against his will. [ECF 46-1 at 90 (Agent Supnick: "And I'm not going to make you any promises, just like I'm not going to sit here and threaten you. Just like I'm not going to force you to be in that chair

any longer than you want to be.")]. Mr. Bennett was also informed on multiple occasions throughout the interview that he was free to leave. [*Id.* at 16, 21, 52, 53, 71, 77].

To the extent Mr. Bennett implies he was assured leniency as to the outcome of the investigation so long as he provided an admission, that contention is meritless. Far from promises or assurances of leniency, officers merely advised Mr. Bennett of the various outcomes the investigation could produce, including Mr. Bennett being formally charged. [*Id*. at 43 (Agent Luley: "You can get charged for this. Are you going to? That's a big question mark right now . . . But can you get charged for this? One hundred percent.")]. Moreover, our Court of Appeals has recognized "[a]gents may properly initiate discussions on cooperation, and may indicate that they will make this cooperation known." *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987). While Mr. Bennett may have been generally encouraged to cooperate during the interview, "[g]eneral encouragement to cooperate is far different from specific promises of leniency." *Id*.

Mr. Bennett's contention that his admissions were adoptions of scenarios presented to him by the interviewing officers fares no better. To the contrary, the record reveals Mr. Bennett persistently refused to adopt the officers' versions of the events in question. [*See, e.g.*, ECF 46-1 at 127:19-139:4]. Instead, he chose to adhere to his own story, despite the officers' insistence his story was nonsensical. [*See id*. at 14 at 144:23-156:10; 160:21-166-3; 169:19-172:14].

Lastly, the interview location also fails to negate the voluntariness of Mr. Bennett's statements. As mentioned, although the interview took place at the police station, the environment was nonthreatening in nature. The interview was conducted in an unlocked office, Mr. Bennet was informed on numerous occasions he was free to leave, and he left the interview by his own free will. Additionally, the three-hour interview was not excessively long, Mr. Bennett was never denied a break, and the overall tone of the conversation was cordial. Finally, while the officers

6

conducting the interview were armed per agency policy, their testimony establishes their firearms were concealed in their hip-holsters and never exhibited or brandished in a threatening manner. [ECF 67 at 39:4-8; 67:2-16].

At bottom, Mr. Bennett has failed to show his will was overborne, or his capacity for self-determination was critically impaired by coercion so as to render his statements involuntary. There is thus no basis for suppression.

### III.

Based on the foregoing discussion, Mr. Bennett's Motion to Suppress Statements [**ECF 46**] is **DENIED**.

The Clerk is directed to transmit a copy of this written opinion and order to the Defendant and his counsel, the United States Attorney, the United States Probation Officer, and the United States Marshal Service.

ENTER:     November 7, 2025

Frank W. Volk
Chief United States District Judge